UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


***************************

UNITED STATES OF AMERICA,
          Plaintiff

vs.                                    Case No. 1:19-cr-10273-RGS-1

RONYEL PENA,
          Defendant

***************************

UNITED STATES OF AMERICA,
          Plaintiff

vs.                                    Case No. 1:19-cr-10273-RGS-2

JOSE MARTINEZ,
          Defendant

***************************


TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
AT BOSTON, MASSACHUSETTS
ON JULY 2, 2019




Prepared by:  Karen M. Aveyard,
              Approved Federal Court Transcriber

     -------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

APPEARANCES:

For the Government:
Alathea E. Porter, Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3318

For Defendant Ronyel Pena:
John H. Cunha, Jr., Esquire
Cunha & Holcomb, PC
1 State Street, Suite 500
Boston, Massachusetts 02109
617-523-4300

For Defendant Jose Martinez:
Gordon W. Spencer, Esquire
945 Concord Street
Framingham, Massachusetts 01701
508-231-4822

<u>I N D E X</u>

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Task Force Officer Joseph Touma | | | | |
| (By Ms. Porter) | 5 | | 51 | |
| (By Mr. Spencer) | | 29 | | 52 |
| (By Mr. Cunha) | | 48 | | |
| | | | | |
| Allison Cornelio | | | | |
| (By Mr. Spencer) | 53 | | | |

<u>E X H I B I T S</u>

| No. | | Page |
|---|---|---|
| 1 | Criminal Complaint and Affidavit of Officer James Keczkemethy | 8 |
| 2 | Photographs of bathroom (4) | 21 |
| 3 | Photograph of bathroom | 22 |
| 4 | Photograph of kitchen (5) | 23 |
| 5 | Photographs of master bedroom (5) | 26 |
| 6 | Photographs of basement (3) | 28 |

1                    P R O C E E D I N G S

2

3            THE CLERK:  The United States District Court for the

4    District of Massachusetts is now in session on July 2nd, the

5    year 2019, in the matter of the United States of America versus

6    Ronyel Pena and Jose Martinez, Criminal Case No. 2019-5251.

7            Could counsel please identify themselves for the

8    record.

9            MS. PORTER:  Good afternoon, your Honor.  Alathea

10   Porter on behalf of the Government.

11           MR. CUNHA:  Good afternoon, your Honor.  John Henry

12   Cunha on behalf of Ronyel Pena, who is seated to my right and

13   your left.

14           MR. SPENCER:  Good afternoon, Judge.  Gordon Spencer

15   on behalf of the defendant, Mr. Jose Martinez.  He is to my

16   left.

17           THE COURT:  So we're scheduled for a probable cause

18   and detention hearing.  Everybody ready to proceed?

19           MR. SPENCER:  Yes, your Honor.

20           MS. PORTER:  Yes, your Honor.

21           THE COURT:  Government, call your first witness,

22   please.

23           MS. PORTER:  Thank you, your Honor.  The Government

24   calls Task Force Officer Joe Touma.

25           (The Witness was sworn.)

1          THE CLERK:  Please state your full name, spelling your

2     last name for the record.

3          THE COURT:  You may proceed.

4          THE WITNESS:  Joseph Touma, T-O-U-M-A.

5          MS. PORTER:  If I may approach, your Honor, I have

6     copies of the intended exhibits for the witness.  Also, a copy

7     for the Court.  I've provided copies to both defense counsel.

8          THE COURT:  Thank you.

9     **DIRECT EXAMINATION OF TASK FORCE OFFICER JOSEPH TOUMA**

10    **BY MS. PORTER:**

11    **Q.**   Good afternoon.  Would you please state your name again

12    for the record.

13    **A.**   It's Joseph Touma, T-O-U-M-A.

14    **Q.**   What is your current assigned position?

15    **A.**   I'm a Task Force Officer with the DEA Cross-border

16    Initiative Group.

17    **Q.**   And as a Task Force Officer, what are you general duties

18    and responsibilities?

19    **A.**   Narcotics investigations, primarily.

20    **Q.**   In addition to being a task force officer, are you

21    employed by a particular law enforcement agency?

22    **A.**   I am, the Salem, New Hampshire, Police Department.

23    **Q.**   How long have you been with the New Hampshire Police

24    Department?

25    **A.**   I've been in Salem for seven years.

1  **Q.**   And what's your rank at Salem?

2  **A.**   I'm a Narcotics Detective.

3  **Q.**   What kind of training and experience do you have with

4  respect to narcotics investigations?

5  **A.**   Police academies, multiple trainings, DEA narcotics

6  school.

7  **Q.**   In the course of your experience, have you conducted

8  investigations into narcotic trafficking organizations?

9  **A.**   I have.

10  **Q.**   Can you generally describe what those investigations

11  entail?

12  **A.**   They entail -- every investigation is different, but it's

13  the purchase and sale of narcotics, illegal narcotics;

14  specifically, Fentanyl in the Merrimack Valley area.

15  **Q.**   Have you participated in controlled purchases involving

16  use of an undercover agent?

17  **A.**   Yes.

18  **Q.**   Have you debriefed witnesses in the course of these

19  investigations?

20  **A.**   Yes.

21  **Q.**   Have you also executed arrests?

22  **A.**   Yes.

23  **Q.**   Have you executed search warrants?

24  **A.**   Yes.

25  **Q.**   Based on your training and experience, are you generally

1    familiar with both the terms used to describe various

2    narcotics, as well as the amounts to purchase those narcotics?

3    **A.**    I am.

4    **Q.**    Now, if you would, please look at what's been marked as

5    Government Exhibit 1 in front of you.

6              Do you recognize that?

7    **A.**    I do.

8    **Q.**    What is it?

9    **A.**    It's a Criminal Complaint prepared by Agent James

10   Keczkemethy in reference to the incident, the arrests.

11   **Q.**    And is the affidavit of Agent Keczkemethy has -- I'm going

12   to keep saying that name wrong and I apologize to him, who is

13   not present today -- "Keczkemethy" is the author of this

14   affidavit; is that correct?

15   **A.**    That's correct.

16   **Q.**    You did not author this affidavit?

17   **A.**    I did not.

18   **Q.**    Were you involved in the investigation that's detailed in

19   this affidavit?

20   **A.**    I was.

21   **Q.**    And have you reviewed this affidavit?

22   **A.**    I have.

23   **Q.**    Is it true and accurate to the best of your knowledge?

24   **A.**    Yes.

25              MS. PORTER:  Your Honor, I move Exhibit 1.

1          THE COURT:  Any objection?

2          MR. SPENCER:  No, your Honor.

3          MR. CUNHA:  No, Judge.

4          THE COURT:  Marked as Exhibit 1.

5          **(Exhibit No. 1 admitted.)**

6    BY MS. PORTER:

7    **Q.**   If you would just generally give the basic background into

8    the investigation that's detailed in this affidavit, when did

9    it begin and what was the nature of the investigation?

10   **A.**   So in the spring of this year, 2019, members of the agency

11   I'm working with received information of a drug trafficking

12   organization by the name of Jay that would -- you could text an

13   order an order of Fentanyl and set up a purchase of Fentanyl

14   through that phone number.

15   **Q.**   To this phone number that agents knew to be belonging to

16   the Jay drug trafficking organization?

17   **A.**   Correct.

18   **Q.**   And directing your attention to -- I'm sorry, I'll back up

19   just one minute.

20          Did agents subsequently identify who they understood

21   Jay was?

22   **A.**   Not originally, but yes, eventually we did.

23   **Q.**   Who is that?

24   **A.**   We believe it to be Jose Martinez.

25   **Q.**   Directing your attention to April 29th of 2019, with

1  respect to this investigation, what, if anything, happened on
2  that day?
3  **A.**   So undercover officers placed a text and/or telephone
4  calls to the Jay organization telephone number, and it was set
5  up that -- it was determined through the texts and/or telephone
6  conversations that there would be a sample provided to the
7  undercover officer of Fentanyl.  The undercover officer was
8  asked to go to 104 Hancock Street in Lawrence, Massachusetts,
9  to meet with somebody to pick up approximately two grams of
10 Fentanyl.
11 **Q.**   Prior to going to that location, was the undercover
12 officer fitted with any type of recording device?
13 **A.**   Yes, he was fitted with audio and video recording.
14 **Q.**   Were agents conducting surveillance in the area?
15 **A.**   Yes, we were.
16 **Q.**   Approximately midday of that day on April 29th, what
17 happened?
18 **A.**   The undercover officer arrived in the area of 104 Hancock
19 Street in Lawrence.  He was directed towards a dumpster.  He
20 went to the dumpster area.  He was approached by a Hispanic
21 male riding on a skateboard.  The Hispanic male gave him a
22 small baggy containing a whitish, off-colored substance
23 believed to be Fentanyl, and the undercover officer departed
24 with the substance.
25 **Q.**   And was that substance field tested?

1    **A.**    It was not.

2    **Q.**    Has it subsequently been tested?

3    **A.**    It's been sent to the lab.

4    **Q.**    Do you have the results from the lab yet?

5    **A.**    Not yet.

6    **Q.**    Now directing your attention to May 6th of 2019, what, if

7    anything, with respect to this investigation happened on that

8    day?

9    **A.**    Again, undercover officers were asked to -- or reached out

10   via text and telephone calls to the Jay organization telephone

11   number.  It was agreed that they could set up 20 grams of

12   Fentanyl in exchange for $400 of official agency funds from the

13   Government.  The meet location was, again, at 104 Hancock

14   Street in Lawrence, Massachusetts.

15   **Q.**    Do you recall specifically what language the undercover

16   used to order the amount of Fentanyl?

17   **A.**    I believe he put two fingers for 400.

18   **Q.**    And could you just briefly explain, what is a finger?

19   **A.**    A finger is 10 grams of suspected Fentanyl.  Each finger,

20   two fingers, adding to 20 grams of Fentanyl.

21   **Q.**    Prior to meeting with Jay or his associate, what, if

22   anything, happened with respect to the undercover?

23   **A.**    The undercover was equipped with the audio and video

24   recording like before.

25   **Q.**    And what happened next?

1  **A.**    He arrived in the area of 104 Hancock Street.  Again,

2  texting and/or telephone calls were made to the Jay

3  organization telephone number.  He was then approached by a

4  male wearing or having a cropped beard, later identified as

5  Ronyel Pena.

6  **Q.**    What happened when they met?

7  **A.**    When they met, Mr. Pena provided the undercover officer

8  with a baggy containing a clearish or tan off-white powdery

9  substance believed to be Fentanyl.  The undercover officer

10  handed Mr. Pena $400 in official agency funds.

11  **Q.**    And based on the training of the agents involved in the

12  investigation, what did they believe that substance to be?

13  **A.**    They believed it to be Fentanyl.

14  **Q.**    Was that substance field tested?

15  **A.**    It was not.

16  **Q.**    Has it been subsequently sent for additional testing?

17  **A.**    It has.

18  **Q.**    Do you have the results of that test?

19  **A.**    Not yet.

20  **Q.**    Now directing your attention to June 17th of 2019, what,

21  if anything, in connection with this investigation happened on

22  that day?

23  **A.**    Originally, the undercover officer, again, reached out via

24  text and telephone calls to the target telephone number, Jay,

25  the drug trafficking organization.  He asked for 50 grams of

1    Fentanyl for the purchase in exchange for $1,000 of official

2    agency funds.  He was instructed to go -- the undercover was

3    instructed by the Jay organization to go to 30 Cedar Street.

4    He was equipped with his audio and video recording.

5            THE COURT:  Is that in Lawrence?

6            THE WITNESS:  Yes, ma'am.

7    **A.**    So he arrived at 30 Cedar Street in Lawrence.  He was

8    told, again via text or telephone calls, to walk to a black

9    Dodge in the area of Chardon Street.

10   **Q.**    Were agents conducting surveillance in this area?

11   **A.**    Yes, they were.

12   **Q.**    So he was directed to go towards a black Dodge?

13   **A.**    Black Dodge on Chardon Street.  There was some talk of

14   a -- the drugs would be near a wheel.

15   **Q.**    What, if anything, did agents conducting surveillance

16   observe in that area on Chardon Street at that time?

17   **A.**    In that area they observed Mr. Pena on the front porch of

18   22 Chardon Street.

19   **Q.**    What happened after that?

20   **A.**    The undercover walked, I believe, towards the black Dodge.

21   Mr. Pena walked from 22 Chardon Street to meet the undercover

22   officer and an exchange was made of -- Mr. Pena provided a ball

23   of what was believed to be 50 grams of Fentanyl to the

24   undercover officer in exchange for $1,000 of official agency

25   funds.

1    **Q.**   Did agents observe Mr. Pena after that transaction

2    occurred?

3    **A.**   Yes, they did.

4    **Q.**   And what did Mr. Pena do?

5    **A.**   Mr. Pena eventually walked back to 22 Chardon Street and

6    entered the residence via the back door.

7    **Q.**   Later that afternoon did the undercover officer have

8    further contact with the Jay target telephone?

9    **A.**   Yes.  He texted the Jay organization back and said he had

10   another customer for him and wanted to purchase more Fentanyl.

11   **Q.**   Did they agree to do so?

12   **A.**   They did.  They agreed upon 40 grams of Fentanyl to be

13   delivered from the Jay organization to the undercover.

14   **Q.**   Was there any other further discussion about the amount

15   that they were going to pay for that exchange?

16   **A.**   Yes.  So for the 40 grams, 10 grams were going to be paid

17   for at the time of arrival for $300 in official agency funds,

18   and the 30 remaining grams provided to the undercover would be

19   paid at a later date for $600.

20   **Q.**   Following that series of communications with the Jay

21   organization telephone, what happened next?

22   **A.**   The undercover was directed to go to the bottom of the

23   hill on Hudson Ave. in Lawrence, Massachusetts.  He

24   subsequently went there with surveillance units in the area.

25   He, again, met with Mr. Pena.

1    **Q.**   How did Mr. Pena arrive at that location?

2    **A.**   Mr. Pena arrived in a black Dodge Durango.

3          Mr. Pena exited the vehicle, I believe, the passenger

4    side, walked up to the undercover and provided him with the 40

5    grams of additional suspected Fentanyl in a plastic baggy,

6    whitish-tanish color substance.

7    **Q.**   And was that substance field tested?

8    **A.**   It was not.

9    **Q.**   Has it subsequently been sent for testing?

10   **A.**   It has.

11   **Q.**   Do you have the results of those tests?

12   **A.**   Not yet.

13   **Q.**   Following that transaction, what did Mr. Pena do?

14   **A.**   Mr. Pena then went back to the Dodge Durango, entered, and

15   the vehicle was surveilled or watched as it drove through the

16   City of Lawrence and arrived in the area of 22 Chardon Street

17   in Lawrence, Massachusetts.  Mr. Pena was then seen meeting up

18   with other individuals towards the rear of 22 Chardon Street

19   and the males eventually all went into 22 Chardon Street, I

20   believe through the back door.

21   **Q.**   Now directing your attention to June 27th of 2019, just

22   this past Thursday, what, if anything, in connection with the

23   investigation happened on that day?

24   **A.**   Again, undercover officers reached out to the phone

25   number, the Jay organization phone number, and an agreement was

1    made to purchase 70 grams of Fentanyl in exchange for $1,900 in

2    official agency funds.  It was also discussed, I believe, that

3    the remainder of the money that was fronted for the 30 grams on

4    the prior deal was to be paid as well, the $600.

5    **Q.**    Just directing your attention to Page 6 of Exhibit 1, if

6    you wouldn't mind looking at Paragraph 18, did you notice a

7    typographical error in this affidavit today?

8    **A.**    I did, yes.

9    **Q.**    And what is that, if you would just point it out to the

10   Court?

11   **A.**    So on the third -- in Paragraph 18, third sentence, in

12   exchange -- 70 grams of suspected Fentanyl in exchange for

13   $1900, as well as paid the $300 owed from the June 17th, it

14   should be $600 owed from the June 17th, the second buy.

15   **Q.**    Thank you.

16          After those communications completed, what happened,

17   what did the UC do?

18   **A.**    The UC arrived on Cedar Street near Chardon Street, almost

19   near the corner of Cedar and Chardon Street, and waited, and

20   was told somebody would be there shortly with the 70 grams.

21   Surveillance units were already set up in the area.  They

22   observed Mr. Pena walk into 22 Chardon Street.  Shortly

23   thereafter he exited, and he eventually made his way to Cedar

24   Street, got into the undercover vehicle, and that's when law

25   enforcement units converged and made an arrest.

1   **Q.**   After Mr. Pena was arrested, were any items found on his

2   person?

3   **A.**   Yes.  There was a ball of whitish-tanish substance,

4   approximately 70 grams, believed to be Fentanyl.

5   **Q.**   Was that substance field tested?

6   **A.**   No.

7   **Q.**   Has it been sent for testing at the DEA Northeast Regional

8   Laboratory?

9   **A.**   It has.

10   **Q.**   You don't have the results of those tests, do you?

11   **A.**   Correct.

12   **Q.**   After Mr. Pena was detained, did agents subsequently call

13   the Jay telephone again?

14   **A.**   They did.

15   **Q.**   And what happened when they made that call?

16   **A.**   I believe a male answered the phone and agents heard dogs,

17   a few dogs barking in the background.

18   **Q.**   After making that phone call, what happened next?

19   **A.**   Agents eventually went over 22 Chardon Street, set up a

20   perimeter along the house, observed numerous video cameras all

21   along the house, observed the blinds were shut, observed trash

22   bags that were in the windows in the inside blocking view,

23   heard dogs barking inside.  Officers and agents began knocking

24   on the doors, banging on the doors, identifying themselves;

25   eventually made contact with somebody on the second floor, a

1    female who said that the people on the first floor had recently

2    moved in.

3           Subsequently, officers and agents then went back

4    downstairs --

5    **Q.**   Did agents and officers hear anything in the downstairs

6    floor when they came back downstairs?

7    **A.**   They did.  They heard some rustling around, what they

8    believe in the rear bedroom.  At that time it was our belief

9    that there could be destruction of evidence or whatnot in the

10   house, so it was determined that the officers and agents make

11   entry into the home.

12   **Q.**   Once they made entry into that unit, that's the

13   first-floor unit, correct?

14   **A.**   Correct.

15   **Q.**   Did they encounter any individuals upon entering the unit?

16   **A.**   Entering the unit, yes.  There was two individuals that

17   were, I believe, in the rear master bedroom that came out and

18   were handcuffed.  Officers then began to clear the house and

19   noticed that the bathroom window had been opened.  A person

20   later identified as Jose Martinez had jumped out the window and

21   ran down the street.

22   **Q.**   Was he detained after running down the street?

23   **A.**   He was.

24   **Q.**   And those were agents that were in the perimeter of the

25   area, correct?

1    **A.**   Correct.

2    **Q.**   Was he brought back to 22 Chardon Street?

3    **A.**   He was.

4    **Q.**   Once Mr. Martinez was brought back 22 Chardon Street, were

5    you personally present at 22 Chardon Street?

6    **A.**   Yes.

7    **Q.**   Did you observe Mr. Martinez as he was brought back inside

8    to 22 Chardon Street?

9    **A.**   Yes.

10   **Q.**   Can you identify him, is he in the courtroom today?

11   **A.**   He is.

12   **Q.**   Would you just point him out, please.

13   **A.**   He's the one in the darker tan outfit with -- the cleaner

14   shaven of the two defendants.

15           MS. PORTER:  I would ask that the record reflect

16   identification of Jose Martinez.

17           THE COURT:  So reflected.

18   BY MS. PORTER:

19   **Q.**   Were you also present when Mr. Pena was arrested in the

20   undercover car that day?

21   **A.**   Yes.

22   **Q.**   Is Mr. Pena present in the courtroom today?

23   **A.**   He is.

24   **Q.**   Would you please identify him.

25   **A.**   He's sitting to the right of his attorney with a beard,

1    short hair.

2            MS. PORTER:  I ask that the record reflect the

3    identification of Mr. Pena.

4            THE COURT:  So reflected.

5    BY MS. PORTER:

6    **Q.**  Once agents were back in 22 Chardon Street and the three

7    male individuals were detained, what did you do?

8    **A.**  The house was secured and we had agents then begin the

9    process of a search warrant, applying for a search warrant.

10   **Q.**  Did agents conduct any search of the premises at that

11   time?

12   **A.**  No.

13   **Q.**  Did agents provide the Miranda warnings or read the rights

14   to the individuals who were present there that day?

15   **A.**  Yes, all three were read their Miranda Rights.

16   **Q.**  Did all three speak English?

17   **A.**  Yes.

18   **Q.**  And did they acknowledge they understood their rights?

19   **A.**  Yes.

20   **Q.**  Do you remember or recall the name of the three

21   individuals who were there that day?

22   **A.**  Mr. Martinez.  There was an individual, last name Fricas,

23   and another individual, last name Reynoso.

24   **Q.**  After being advised of their rights and acknowledging that

25   they understood their rights, did Mr. Fricas agree to speak

1    with agents?

2    **A.**    He did.

3    **Q.**    And what, if anything, did Mr. Fricas tell agents with

4    respect to Mr. Martinez?

5    **A.**    He said that -- he referred to Mr. Martinez and said he

6    was the one we were looking for.  He identified him as Jay.  He

7    said that after Mr. Pena had been arrested, Mr. Martinez had

8    received a phone call from his girlfriend telling him that

9    Mr. Pena had been arrested.

10           He also said that as agents and officers began

11   knocking on the door, Mr. Fricas was told that he was to go

12   into the master bedroom.  He observed Mr. Martinez bringing

13   bags with what he described as bigger than a baseball, smaller

14   than a softball, size containing whitish-tanish substance along

15   with green pills, what he believed to be pills, into the

16   bathroom, and he heard excessive flushing of the toilet.

17   **Q.**    At some point that evening did agents receive

18   authorization to search the premises at 22 Chardon Street?

19   **A.**    Yes, we did.

20   **Q.**    After receiving that authorization, did agents conduct a

21   search?

22   **A.**    Yes, we did.

23   **Q.**    Now I want to direct your attention to what's been marked

24   as Government Exhibit 2.  It should contain four photographs.

25   If you would please take a look through those.  Let me know if

1    you recognize them.

2    **A.**    I do.

3    **Q.**    What are they?

4    **A.**    They're pictures of the bathroom, yes.

5    **Q.**    And this is at 22 Chardon Street?

6    **A.**    Correct.

7    **Q.**    Do these pictures accurately reflect items seen in the

8    bathroom at 22 Chardon Street?

9    **A.**    They do.

10                MS. PORTER:  I would move to admit these, your Honor.

11                MR. SPENCER:  No objection.

12                MR. CUNHA:  No, your Honor.

13                THE COURT:  Moved as Exhibit 2.

14                **(Exhibit No. 2 admitted.)**

15    BY MS. PORTER:

16    **Q.**    If you would please describe what is seen in the first

17    picture.

18    **A.**    The first picture is a picture of a smashed up cell phone

19    in the sink.

20    **Q.**    And now on to the second picture.

21    **A.**    The second picture is underneath the sink, the cabinet, in

22    the bathroom; numerous -- the look like they're just green

23    pills, hollowed-out pills.  Nothing has been in them.

24    **Q.**    Where were these found?

25    **A.**    Underneath the sink in the bathroom.

1    **Q.**    If you would turn to the next picture, is that just a

2    close-up of the prior picture?

3    **A.**    It is.

4    **Q.**    Now the last picture in that group.

5    **A.**    The last picture is the toilet with green water and what

6    appeared to be one of the capsules in the water dissolving.

7    **Q.**    Thank you.

8            Now if you would look at what has been marked as

9    Government Exhibit 3, it's a single photograph.

10           Do you recognize that?

11   **A.**    Yes.

12   **Q.**    What is it?

13   **A.**    That is one of the bedrooms, the smaller of the two.

14   **Q.**    And is that an accurate depiction of how that looked at

15   the time you executed the search warrant?

16   **A.**    Yes.

17           MS. PORTER:  I would move to admit Government

18   Exhibit 2.

19           THE COURT:  Three.

20           MS. PORTER:  Three.

21           MR. SPENCER:  No objection.

22           THE COURT:  So marked.

23           **(Exhibit No. 3 admitted.)**

24   BY MS. PORTER:

25   **Q.**    If you can just describe what is shown up in the upper

1  left-hand corner of that picture.

2  **A.**   There's a television with what appears to be and what was

3  video surveillance footage from all of the outside of the home.

4  **Q.**   Now if you would turn to what's been marked as Government

5  Exhibit 4, it's a series of photographs, five photographs.

6          Do you recognize those?

7  **A.**   I do.

8  **Q.**   What are these photographs of?

9  **A.**   They're of the kitchen.

10 **Q.**   This is the kitchen at 22 Chardon Street?

11 **A.**   Yes.

12 **Q.**   And do these accurately reflect how the kitchen looked

13 that evening?

14 **A.**   They do.

15         MS. PORTER:  Your Honor, I would move to admit

16 Government Exhibit 4.

17         MR. SPENCER:  No objection.

18         THE COURT:  So marked.

19         **(Exhibit No. 4 admitted.)**

20 BY MS. PORTER:

21 **Q.**   If you would please describe what's shown in the first

22 photograph.

23 **A.**   The first photograph is the kitchen table and above it is

24 a large television screen with surveillance footage of the

25 outside of that home.

1    **Q.**   You previously testified you observed cameras outside of

2    the home; is that correct?

3    **A.**   That's correct.

4    **Q.**   Do these angles show outside of that home at 22 Chardon

5    Street?

6    **A.**   They do.

7    **Q.**   If you would turn to the next photograph, please, what's

8    in that picture?

9    **A.**   The next photograph, there are numerous clear plastic

10   baggies with what appears to be a white powdery residue.  Some

11   of them are wet.  There are numerous scales with, again, white

12   powdery residue on top of the scales.  That's it.

13          Oh --

14   **Q.**   Just above the scales, is there something else

15   (inaudible)?

16   **A.**   Sorry, yes.  There are two smashed up cell phones.

17   **Q.**   Where were these items found?

18   **A.**   In the trash can located in the kitchen.

19   **Q.**   They're currently on the floor, correct, but that's not

20   where they were originally found?

21   **A.**   Correct.

22   **Q.**   And turning to the next photograph, what is that?

23   **A.**   That's what is believed to be a pill capsule press.

24   **Q.**   Where were those found?

25   **A.**   Those were found in the stove of the kitchen, in the

1    kitchen.

2    **Q.**    Now turning to the next photograph, what's shown in that

3    photograph?

4    **A.**    The next photograph, there's numerous clear plastic

5    baggies in the top left.  Next to it is lactose, which is a

6    white powdery substance commonly used as a cutting agent for

7    Fentanyl or other drugs.

8    **Q.**    And what do you mean by "cutting agent"?

9    **A.**    It's used to mix, to dilute with the narcotic.

10    **Q.**    Now the last photograph in that group.

11    **A.**    The last photograph is taken of the kitchen table.  There

12    was a box containing a large amount of cash.

13    **Q.**    Now directing your attention to the next group of

14    photographs that have been marked as Government Exhibit 5,

15    there are five photographs in that group.  If you would just

16    flip through and tell me if you recognize them.

17    **A.**    I do.

18    **Q.**    Where were these photographs taken?

19    **A.**    These were taken in the master bedroom.

20    **Q.**    And do these accurately reflect the images that were found

21    in the master bedroom that evening?

22    **A.**    They do.

23            MS. PORTER:  Your Honor, I would move to admit

24    Government Exhibit 5.

25            MR. SPENCER:  No objection.

1          MR. CUNHA:  No objection.

2          THE COURT:  So marked.

3          **(Exhibit No. 5 admitted.)**

4   BY MS. PORTER:

5   **Q.**   If you would please describe what's shown in the first

6   photograph.

7   **A.**   The first photograph is a bullet-proof vest containing

8   ceramic plates.

9   **Q.**   Where was that bullet-proof vest found?

10  **A.**   I believe underneath the bed.

11  **Q.**   And this is in the master bedroom?

12  **A.**   Correct.

13  **Q.**   Looking at the next photograph, what is that?

14  **A.**   Those are two rifle rounds, .223 rifle rounds.

15  **Q.**   Where were those found?

16  **A.**   Those were found in the bedroom, I believe, in a bag in

17  the master bedroom.

18  **Q.**   I don't know if you already said this, but do you know

19  what type of gun those bullets are for?

20  **A.**   Yeah, it's for a rifle, a .223 or 5.56.

21  **Q.**   Thank you.

22          Now looking at the next photograph?

23  **A.**   Gun oil.

24  **Q.**   And where was that found?

25  **A.**   Found in one of the drawers of the dresser, I believe, or

1    nightstand.

2    **Q.**   Again, these are in the master bedroom?

3    **A.**   Correct.

4    **Q.**   Now the next photograph.

5    **A.**   The next photograph is a pair of pants and there's cash

6    inside the pocket of the pants.

7    **Q.**   And now the last photograph in that group.

8    **A.**   The last photograph is a money counter.

9    **Q.**   Not depicted in any of these photographs, but did agents

10   also find another item in the master bedroom that relates to a

11   firearm?

12   **A.**   Yes.

13   **Q.**   What was that?

14   **A.**   I believe it was some sort of handle that would go onto a

15   pistol.

16   **Q.**   Now looking at the last exhibit, which has been marked as

17   Government Exhibit 6, there are three photographs.

18        Do you recognize those?

19   **A.**   I do.

20   **Q.**   Where were those photographs taken?

21   **A.**   These were taken in the basement of 22 Chardon Street.

22   **Q.**   And do these pictures accurately reflect the items found

23   in the basement?

24   **A.**   They do.

25        MS. PORTER:  Your Honor, I move to admit Government

1     Exhibit 6.

2             MR. SPENCER:  No objection.

3             THE COURT:  So marked.

4             **(Exhibit No. 6 admitted.)**

5     BY MS. PORTER:

6     **Q.**   Would you please describe what's shown in the first

7     photograph.

8     **A.**   So on some insulation there's a rifle.  It's a Kel Tec

9     5.56 assault rifle along with a Glock pistol.

10    **Q.**   And if you would look on the next page, please, what's

11    shown in that photograph?

12    **A.**   The same weapons, the assault rifle 5.56 Kel Tec and the

13    Glock pistol, with magazines containing ammunition.

14    **Q.**   Were those firearms loaded when they were found?

15    **A.**   I believe so, yes.

16    **Q.**   Now the last photograph.

17    **A.**   The last photograph is a wallet containing a health card

18    with the name Jose Martinez.

19    **Q.**   After he had been advised of his Miranda Warnings and

20    stated that he understood them, did Mr. Martinez make any

21    statements to agents with respect to the items in the basement?

22    **A.**   He did.

23    **Q.**   What was that?

24    **A.**   He said -- I'm going to have to refer to the report to

25    give the exact quote.  Is that okay?

1    **Q.**    Yes, absolutely.

2          (Pause.)

3    **A.**    When asked about it, about the gun, he said, I didn't find

4    my wallet with the guns.  We had told him, or officers had told

5    Mr. Martinez, that two guns were found and his wallet was with

6    the guns, and he said, "You didn't find my wallet with the

7    guns.  It was in a suitcase."

8    **Q.**    Where did agents find that wallet?

9    **A.**    The wallet was in a suitcase approximately ten feet from

10   where the guns were found.

11   **Q.**    Did Mr. Martinez make any other statements with respect to

12   22 Chardon Street?

13   **A.**    He did.  He identified the master bedroom where the

14   ballistic vest, the rifle rounds, the piece of the handgun, and

15   the money counter and other substances as his bedroom.

16   **Q.**    And did he tell agents that he lived there?

17   **A.**    He did.

18          MS. PORTER:  No further questions at this time, your

19   Honor.

20          THE COURT:  Cross-examination?

21          MR. SPENCER:  Thank you.

22     **CROSS-EXAMINATION OF TASK FORCE OFFICER JOSEPH TOUMA**

23   **BY MR. SPENCER:**

24   **Q.**    Good afternoon.

25   **A.**    Good afternoon, sir.

1   **Q.**   For the record, my name is Gordon Spencer.  I represent

2   Mr. Martinez.  I'm just going to ask you a few questions.

3   **A.**   Sure.

4   **Q.**   You arrested Mr. Martinez on June 27th of this year,

5   right?

6   **A.**   Correct.

7   **Q.**   And he was charged with conspiracy to distribute Fentanyl

8   along with Mr. Pena, correct?

9   **A.**   Correct.

10   **Q.**   Had you ever seen Mr. Pena and Mr. Martinez ever in

11   communication with each other?

12   **A.**   No.

13   **Q.**   Or more specifically, have you ever received information

14   that these two were conspiring together to distribute narcotics

15   prior to your arrest?

16   **A.**   No.

17   **Q.**   And you testified on direct examination that there was, I

18   believe you stated, a Jay organizational telephone number?

19   **A.**   Correct.

20   **Q.**   Well, that's not what's actually listed in this affidavit,

21   is it?  It's called a target telephone number, right?

22   **A.**   Target telephone number identified as Jay.

23   **Q.**   Jay, meaning the words "Jay organization" is not listed

24   anywhere in this affidavit, right?

25   **A.**   I'm not sure.

 1   **Q.**   Have you read the affidavit?

 2   **A.**   I have.

 3   **Q.**   One second.

 4          Have you read the affidavit in anticipation or

 5   preparation for your testimony?

 6   **A.**   Yes.

 7   **Q.**   And do you have any memory of the words "Jay

 8   organizational phone" being used?

 9   **A.**   No.

10   **Q.**   If you remember.

11   **A.**   I remember Jay.

12   **Q.**   So, specifically, did you have any information prior to

13   June 27th that Jay was Mr. Jose Martinez?

14   **A.**   No.

15   **Q.**   What did you know about this Jay person prior to June 27th

16   of 2019?

17   **A.**   About the actual person?

18   **Q.**   The person, not --

19   **A.**   Unknown who it was.

20   **Q.**   Didn't know who it was?

21   **A.**   Didn't know who it was.

22   **Q.**   Well, you knew that Jay was using this telephone number,

23   right?

24   **A.**   Correct.

25   **Q.**   How did you know that?

1    **A.**   Well, based on the information that agents and officers

2    received, it was -- the number was associated with the name of

3    Jay.

4    **Q.**   Jay, that's all you knew?

5    **A.**   That's all I knew.

6    **Q.**   And what was that telephone number?

7    **A.**   I'd have to refer to the report.

8    **Q.**   Is it in the report?

9    **A.**   I believe so.

10   **Q.**   So I won't ask you the question.

11          Did you ever see Mr. Jose Martinez ever using that

12   telephone number?

13   **A.**   No.

14   **Q.**   Did you ever see Mr. Martinez in possession of a phone

15   which held that number?

16   **A.**   No.

17   **Q.**   Were you aware of the race or ethnicity of this person Jay

18   prior to June 27th?

19   **A.**   No.

20   **Q.**   Or any car that he drove?

21   **A.**   No.

22   **Q.**   So this person, we'll call him Jay, used this telephone to

23   broker four drug transactions between May and June of 2019,

24   right?

25   **A.**   April through -- yes.

1   **Q.**   I'm sorry, you're right?

2   **A.**   Yes, sir.

3   **Q.**   April and June, right?

4   **A.**   Correct.

5   **Q.**   The first one was two bags of Fentanyl, correct?

6   **A.**   Correct.

7   **Q.**   The second was 20 grams?

8   **A.**   Correct.

9   **Q.**   Fifty grams?

10  **A.**   Correct.

11  **Q.**   And then 70 grams?

12  **A.**   I'm sorry, 90 grams and then 70 grams, yes.

13  **Q.**   Ninety grams.  I'm sorry.

14          For that first transaction, Jay told the person to go

15  to 104 Hancock Street, right?

16  **A.**   Correct.

17  **Q.**   Does Mr. Martinez have any connection that you're aware of

18  to 104 Hancock Street?

19  **A.**   I don't know.

20  **Q.**   Then during the third transaction he was told to go to

21  30 Cedar Street, which changed to Chardon Street, right?

22  **A.**   Correct.

23  **Q.**   Then the last one was at Chardon Street, right?

24  **A.**   Correct.

25  **Q.**   Now, I note in the affidavit that at least one of these

1   phone conversations was recorded.

2   **A.**   Yes, I believe they all were.

3   **Q.**   They all were?

4   **A.**   I believe so.

5   **Q.**   Clearly, one of them was, right?

6   **A.**   Yes.

7   **Q.**   (Inaudible.)

8   **A.**   I believe they all were, but I'm pretty sure that at least

9   one of them was.

10   **Q.**   So you've had a chance to listen to these recordings?

11   **A.**   No, I have not.

12   **Q.**   Did you have a chance to speak with Mr. Martinez on the

13   day that he was arrested?

14   **A.**   Yes.

15   **Q.**   Did he specifically state that he had made no phone calls

16   to broker any drug deals over the last couple of months, did he

17   not tell you that?

18   **A.**   I didn't ask him that and I didn't hear --

19   **Q.**   Did you hear him state -- I'm sorry.

20   **A.**   No, I didn't hear him say that to anybody.

21   **Q.**   Did you hear him demand for voice recognition to determine

22   that he wasn't the person that was making these calls?

23   **A.**   I didn't hear that.

24   **Q.**   You never heard that?

25   **A.**   No.

1    **Q.**   But you did draw the inference that whoever was making

2    these calls during these four drug transactions was in fact the

3    supplier, Jay, right?

4    **A.**   I'm sorry, say that again, sir.

5    **Q.**   It's fair to say, based upon your investigation, that the

6    person who was on the target telephone during those four drug

7    transactions was Jay, right?

8    **A.**   Correct.

9    **Q.**   And you believe that Jay is Mr. Jose Martinez based upon

10   your investigation, right?

11   **A.**   Yes.

12   **Q.**   Where are these phone communications, where would they be,

13   these recordings?

14   **A.**   They'd be preserved as evidence with the DEA.

15   **Q.**   Has there been any attempt by any law enforcement officer

16   to listen to these recordings to determine whether or not the

17   person that was on the phone is in fact Jay Martinez?

18   **A.**   After the arrest?

19   **Q.**   After the arrest.

20   **A.**   Not that I'm aware of.

21   **Q.**   Because how long was Mr. Martinez inside that residence,

22   meaning 22 Chardon Street, before he was placed under arrest?

23   **A.**   Oh, hours.

24   **Q.**   Well, he was arrested around early afternoon, maybe 2:00

25   or 3:00 p.m.?

1   **A.**   Yes.

2   **Q.**   What time was the search warrant executed?

3   **A.**   Roughly 9:30 p.m., I believe.

4   **Q.**   And during that whole time, Mr. Martinez was held up in

5   the house under arrest?

6   **A.**   He was detained at that point, yes.

7   **Q.**   Handcuffs?

8   **A.**   Yes.

9   **Q.**   Sitting at a kitchen table?

10  **A.**   Sitting at the kitchen, then moved to the -- a couch.

11  **Q.**   I see.  So during this period of time, officers, including

12  yourself, had an opportunity to hear this man speak?

13  **A.**   Yeah, we spoke to him.  I mean, people spoke to him, yeah.

14  **Q.**   Are you familiar with his voice based on --

15  **A.**   Sure.

16  **Q.**   One second -- based upon the communications you had with

17  him that day?

18  **A.**   Yes.  Yeah.

19  **Q.**   So if you were to listen to the recordings that were

20  preserved that you just mentioned, you'd be able to determine

21  whether or not that was Mr. Martinez's voice on the call?

22  **A.**   I can't say that I would.

23  **Q.**   Now, at he time that Mr. Pena was placed under arrest, it

24  was law enforcement, or your intentions, to go to the residence

25  where Mr. Pena was seen leaving?

1    **A.**    Yes.

2    **Q.**    Did you see which unit he came out of?

3    **A.**    I did not.

4    **Q.**    How many units did 22 Chardon Street have?

5    **A.**    I believe two.

6    **Q.**    So there's a second-floor unit and a first-floor unit,

7    right?

8    **A.**    Correct.

9    **Q.**    But you didn't know which unit Mr. Pena came out?

10   **A.**    I didn't.

11   **Q.**    Nor did you ever see Mr. Pena go into any basement space

12   located in the unit?

13   **A.**    No.

14   **Q.**    And on the previous occasions that you saw Mr. Pena exit

15   out of 22 Chardon Street, I think there was one previous

16   occasion, right, on that June 17th transaction?

17   **A.**    Yes, he exited -- I believe on June 17th he exited from

18   the front porch.

19   **Q.**    And there was three, as of yet, unidentified Hispanic

20   males with him?

21   **A.**    When he return -- on June 17th now, sir?

22   **Q.**    Yes.

23   **A.**    When he returned after surveillance was conducted after

24   the drug transaction was made, he returned to the house and

25   there was -- he met up, I think, with two or three or four

1    other individuals.

2    **Q.**    Who were those people?

3    **A.**    I don't know.

4    **Q.**    Were they ever identified?

5    **A.**    I don't believe so.

6    **Q.**    And you can't say any of those people were Jose Martinez,

7    right?

8    **A.**    I can't.

9    **Q.**    So on that particular day was Mr. Pena seen going into the

10   first-floor unit?

11   **A.**    He was seen going into the back door.

12   **Q.**    Does the back door lead to the first unit as well as to

13   the second unit?

14   **A.**    I believe so.

15   **Q.**    But he was never seen going in and out of that first unit

16   at any point in time prior to your entry, right?

17   **A.**    Correct.

18   **Q.**    Now, when Mr. Pena was placed under arrest, he was

19   actually outside of the unit of 22 Chardon Street, right?

20   **A.**    Yes, he was on Cedar Street.

21   **Q.**    Was there anything in his pockets?

22   **A.**    I don't know.  I don't know if the drugs were found in his

23   pockets or on his person.

24   **Q.**    What drugs?

25   **A.**    The suspected Fentanyl.

1    **Q.**   There was suspected Fentanyl found where?

2    **A.**   On Mr. Martinez.

3    **Q.**   On Mr. Martinez?

4    **A.**   I'm sorry, excuse me, on Mr. Pena.

5    **Q.**   I'm talking about when Mr. Martinez was -- you stated that

6    upon entry, Mr. Martinez fled out of a window.

7    **A.**   Yes.  Correct.

8    **Q.**   He was detained on the street.

9    **A.**   Yes.

10   **Q.**   What was found on Mr. Martinez?

11   **A.**   I don't believe -- wait.  I think there was a couple --

12   oh.

13   **Q.**   A couple cell phones?

14   **A.**   It wasn't me who arrested him, but I believe it was a

15   couple cell phones and cash.

16   **Q.**   So do you have any memory as you sit here today of two

17   cell phones at least being told to you were seized from

18   Mr. Martinez?

19   **A.**   I believe so, yes.

20   **Q.**   And neither of those phones was the target telephone

21   number?

22   **A.**   Unknown.  I don't know that.

23   **Q.**   You don't know that?

24   **A.**   I don't know that.

25   **Q.**   Well, to your understanding, was there any investigation

1   into whether or not those two cellular phones were connected to

2   the target telephone number?

3   **A.**   I don't know that answer.

4   **Q.**   You never asked?

5   **A.**   I never asked.

6   **Q.**   And prior to you forcing entry into that residence, had

7   you ever received any reports from any confidential sources

8   that drugs were being stored at that residence?

9   **A.**   I haven't.

10  **Q.**   Are you aware of any officer related to the investigation

11  that received that information?

12  **A.**   I'm not aware.

13  **Q.**   How many officers were with you that day when you went in

14  to the residence, approximately?

15  **A.**   Approximately -- I'm trying to count them in my head.

16  Maybe --

17  **Q.**   Over ten?

18  **A.**   Yeah, I'd say around there.

19  **Q.**   About ten?

20  **A.**   Around ten.

21  **Q.**   And you stated you made no search of the premises before

22  getting the search warrant?

23  **A.**   Correct.

24  **Q.**   So no protective sweep was done?

25  **A.**   Yeah, we secured the area to make sure there was no other

1    people inside.

2    **Q.**    During that protective sweep, you made no observations of

3    any narcotics or any weapons or any accoutrements such as

4    scales or preps, gun oil, or something along those lines?

5    **A.**    Correct.

6    **Q.**    You made no observations?

7    **A.**    Well, we saw a large amount of cash.  We saw smashed up

8    cell phones.  In plain view, we saw the bathroom.  We saw --

9    **Q.**    Where was the large amount of cash found?

10    **A.**    On the kitchen table.

11    **Q.**    Was that in the Louis Vuitton box?

12    **A.**    Yes.

13    **Q.**    Was that an open box?

14    **A.**    I think it was partially open.

15    **Q.**    So you opened the box?

16    **A.**    I didn't open the box.

17    **Q.**    So how do you know there was cash in there?

18    **A.**    Because it was partially open when I saw it.

19    **Q.**    Oh.  So you could look through the partial opening and see

20    that there was cash in it?

21    **A.**    Probably a few inches.

22    **Q.**    I see.

23    **A.**    You could see there was cash in it.

24    **Q.**    And when you first went into the residence, there's not

25    only Mr. Martinez found inside the house, but there's two other

1    individuals, right?

2    **A.**    Correct.

3    **Q.**    Now, you've stated on direct examination you only gave

4    their last names; would that be fair to say?

5    **A.**    Yes.

6    **Q.**    You said Fricas, F-R-I-C-A-S?

7    **A.**    Okay.

8    **Q.**    Is that what you said?

9    **A.**    I believe so.

10   **Q.**    And Reynoso, R-E-Y-N-O-S-O?

11   **A.**    I believe so.  That's what I remember them to --

12   **Q.**    But they have first names; do they not?

13   **A.**    Yes, they do.

14   **Q.**    What are their names, for the record?

15   **A.**    I believe it's Luis Reynoso, and I'm not sure of Fricas's

16   first name.

17   **Q.**    But it's indicated in the affidavit that you read it in

18   preparation for your testimony, right?

19   **A.**    Yes.  Sure.

20   **Q.**    Does the name Jhamyl, J-H-A-M-Y-L, does that sound

21   familiar?

22   **A.**    Sounds familiar, yes.

23   **Q.**    It begins with the letter J; does it not?

24   **A.**    Yes.

25   **Q.**    Have you ascertained the ages of these two individuals, or

1   at least approximate ages?

2   **A.**   Approximate ages, 18 to 20.

3   **Q.**   Eighteen to 20?

4   **A.**   I believe so.

5   **Q.**   And did you know the age of Mr. Pena?

6   **A.**   I believe he's 18.

7   **Q.**   Do you know the age of Mr. Martinez?

8   **A.**   I believe he's 23.

9   **Q.**   You understand that his birthday is July 19th of 1995?

10  **A.**   Okay.

11  **Q.**   So it would be 24 in a couple of weeks?

12  **A.**   Okay.

13  **Q.**   Is that your understanding?

14  **A.**   If that's what you're telling me.

15  **Q.**   If you don't know, it's fine.  I just want to know if you

16  understood it.

17  **A.**   Alright.

18  **Q.**   So you have these two young individuals that are the same

19  age as Mr. Pena that are found inside the residence, right?

20  **A.**   Yes.

21  **Q.**   And you have an older individual that's also found inside

22  the residence, right?

23  **A.**   Older meaning Mr. Martinez?

24  **Q.**   Mr. Martinez.  Right?

25  **A.**   Yes.

1    **Q.**    And then at the time that you enter, you have no

2    information that suggests Mr. Martinez is Jay over this other

3    person Jhamyl, do you?

4    **A.**    Correct.

5    **Q.**    So it's only based upon the statements of Jhamyl are you

6    able to make the determination that this gentleman, meaning

7    Mr. Martinez, is actually Jay?

8    **A.**    Ah...yes.

9    **Q.**    And how long did you have Mr. -- Mr. Fricas, was he in

10   custody the -- or detained the entire time that Mr. Martinez

11   was?

12   **A.**    Yes.

13   **Q.**    So he's held in the house for six hours or more, right?

14   **A.**    Correct.

15   **Q.**    And he's interrogated, right?

16   **A.**    He was spoken to, yes.

17   **Q.**    Was he spoken to alone?

18   **A.**    No, I believe there was a couple officers and/or agents in

19   the room.

20   **Q.**    I misspoke.  When I mean alone, was he with Mr. Pena or

21   Mr. Martinez at the time he was interrogated?

22   **A.**    No.

23   **Q.**    How many hours did you interrogate Mr. Fricas?

24            MS. PORTER:  Objection to the term "interrogate".

25            THE COURT:  Sustained.

1        MR. SPENCER:  I'm sorry.

2   BY MR. SPENCER:

3   **Q.**   I mean how many hours did you question Mr. Fricas?

4        THE COURT:  Are you asking how long the questioning

5   took place or how long he was in the home?

6        MR. SPENCER:  How long was he being questioned while

7   he was in the home.

8   **A.**   I wasn't the one who questioned him.  I could say

9   approximately -- I don't know.  I was in and out of the room.

10  I can't say.

11  **Q.**   Were you present when he made the statements against

12  Mr. Martinez?

13  **A.**   No.

14  **Q.**   At the time of entry, were your weapons drawn?

15  **A.**   Yes.

16  **Q.**   So if Mr. Martinez fled out the window, it could have been

17  due to fear?

18  **A.**   I suppose.

19  **Q.**   And once he actually left the residence, he was

20  immediately detained, was he not, outside, meaning he didn't

21  get far?

22  **A.**   He didn't get too far.

23  **Q.**   Do you have any first-hand knowledge of him immediately

24  stopping out in the street once he was ordered to by law

25  enforcement?

1  **A.**  I don't.

2  **Q.**  You didn't witness him getting detained?

3  **A.**  I didn't.

4  **Q.**  Were you able to determine for your investigation if

5  Mr. Martinez had any specific nicknames that he went by?

6  **A.**  No.

7  **Q.**  Do you have any recollection of law enforcement joking

8  with Mr. Martinez, kept trying to get him to admit his name was

9  Jay?

10  **A.**  They might have.

11  **Q.**  Did he go to the hospital that day?

12  **A.**  I believe he did.

13  **Q.**  Why did he go to the hospital?

14  **A.**  Something to do with a cut on his hand or something, I

15  believe.

16  **Q.**  So he went to the hospital, then brought back, and then

17  detained again while waiting for the search warrant?

18  **A.**  Detained the whole time, but yes.

19  **Q.**  Did you have him sign any Miranda waivers before he gave

20  any statements, to your knowledge?

21  **A.**  I didn't.

22  **Q.**  Did he tell you he was drug dependent that day?

23  **A.**  He's drug dependent, yes.

24  **Q.**  What type of drug did he tell you he was dependent upon?

25  **A.**  I believe he said it was cocaine.

1    **Q.**    And you found some evidence of cocaine inside the

2    residence?

3    **A.**    Yes.

4    **Q.**    What evidence was that?  Where did you find cocaine?

5    **A.**    I didn't find it.  I believe he directed -- he said the

6    only thing we'd find in the house was a small, I want to say he

7    maybe referred to it as a bump of cocaine, I believe.

8    **Q.**    Was the bump found?

9    **A.**    Yes, it was found.  He directed officers.

10    **Q.**    And the weight of that bump was approximately a gram or

11    so?

12    **A.**    A gram or so, yeah.

13    **Q.**    Consistent with user weight?

14    **A.**    Correct.

15    **Q.**    Did the other two, meaning Mr. Fricas or Mr. Reynoso,

16    admit that they were drug dependent?

17    **A.**    I don't believe they did.

18    **Q.**    Mr. Reynoso, did you know his relationship to the

19    apartment, if you knew?

20    **A.**    I don't know exactly.  I thought they were all friends or

21    he -- I'm not sure.

22    **Q.**    Did Mr. Martinez have a girlfriend that also resided in

23    the apartment?

24    **A.**    He said he did, yes.

25    **Q.**    Did you know what her name was?

1  **A.**  Not off the top of my head.

2  **Q.**  Once you entered the apartment, you decided to go down

3  into the basement to search?

4  **A.**  Yes.

5  **Q.**  Is the basement apartment a common area or was it

6  exclusive to the first floor?

7  **A.**  I believe it's a common area.

8       MR. SPENCER:  Thank you.  I have nothing further.

9       MR. CUNHA:  Just briefly.

10      **CROSS-EXAMINATION OF TASK FORCE OFFICER JOSEPH TUOMA**

11  **BY MR. CUNHA:**

12  **Q.**  With respect to the dates that you gave us earlier,

13  starting with April 29, 2019 --

14  **A.**  Yes.

15  **Q.**  -- when I believe the two-gram sample was purchased --

16  **A.**  Yes.

17  **Q.**  -- were you present at that time?

18  **A.**  I was present.

19  **Q.**  Were you in a -- looking from some vantage point at the --

20  **A.**  I didn't have an eye on the target or the transaction.

21  **Q.**  So did you actually see the transaction?

22  **A.**  I did not, no.

23  **Q.**  And do you know if that person, the one on the skateboard,

24  was that person ever identified?

25  **A.**  I don't believe so.

1  **Q.**  With respect to May 6, 2019, did you view that

2  transaction?

3  **A.**  Um...

4  **Q.**  Were you present, first of all?

5  **A.**  I'm trying to think.

6  **Q.**  That's the one --

7  **A.**  Yeah, I don't think I was --

8  **Q.**  -- according to the affidavit that --

9  **A.**  On Hancock Street.

10  **Q.**  -- there's two fingers and --

11  **A.**  I don't believe so.  There's so many we do.  I don't

12  believe that I was, and if I was there, I didn't see the

13  transaction myself.

14  **Q.**  So you have no personal knowledge of that?

15  **A.**  No.

16  **Q.**  Now, with respect to June 17th, there were two

17  transactions on that date, correct?

18  **A.**  Yes.

19  **Q.**  Do you have any personal knowledge of either one?

20  **A.**  The only personal knowledge I have is surveilling the

21  vehicle as it approached Chardon Street and parked.

22  **Q.**  And did you determine who owned that motor vehicle?

23  **A.**  I did not.

24  **Q.**  Did any of your colleagues determine who -- at least to

25  whom the motor vehicle was registered?

1    **A.**    I'm sure they did, yes.  I'm not sure who it is.

2    **Q.**    But you don't have any knowledge about that?

3    **A.**    I don't, no.

4    **Q.**    Now, with respect to the date that Mr. Pena was arrested,

5    June 27th, same thing, do you have any personal knowledge of

6    what happened that day?

7    **A.**    Yeah.  As we were approaching, I saw Mr. Pena get into the

8    undercover vehicle, and that's when units converged.

9    **Q.**    Now, was there also a vehicle that day, the Dodge -- was

10    the Dodge Durango that day as well or was that just on -- that

11    might have been just on the --

12    **A.**    That was on the other two, I believe.

13    **Q.**    Yeah, that was on the June 17th, the two.

14    **A.**    Yes.

15    **Q.**    Was there any vehicle on June 27th that you saw?

16    **A.**    No, I believe he approached on foot.

17    **Q.**    He approached on foot.  Okay.

18         And you saw him get into the undercover vehicle, but

19    you didn't see anything other than that?

20    **A.**    Correct.

21    **Q.**    Did you see him after he was arrested?

22    **A.**    Yes.

23    **Q.**    Do you know if he made any statements?

24    **A.**    I believe he -- no, I don't believe he said anything like

25    that.  I think he wanted to talk to a lawyer.

1    **Q.**   Do you know if anything was seized from him, a telephone,

2    for instance?

3    **A.**   I don't know if a telephone was.

4    **Q.**   What do you know was seized from him other than what you

5    believe to be contraband?

6    **A.**   Nothing.

7             MR. CUNHA:  I have no further questions.

8             THE COURT:  Anything further?

9             MS. PORTER:  Just briefly, your Honor.

10           **REDIRECT EXAMINATION OF TASK FORCE OFFICER JOSEPH TUOMA**

11   **BY MS. PORTER:**

12   **Q.**   With respect to the May 6, 2019 controlled purchase, you

13   testified that Mr. Pena was observed on the front porch of

14   22 Chardon Street, correct?

15   **A.**   On May 6th?  I thought that was the Hancock Street --

16   **Q.**   I'm sorry.  The June 17th?

17   **A.**   Yes.

18   **Q.**   The front porch at 22 Chardon Street, does that lead to a

19   common area?

20   **A.**   No.

21   **Q.**   Only to the first floor unit?

22   **A.**   Yes.

23   **Q.**   With respect to Mr. Fricas, when agents spoke with him

24   that day, did he have any connection to 22 Chardon Street other

25   than being present there that day?

1    **A.**    I don't believe so.

2    **Q.**    Any indication that he lived there?

3    **A.**    No.

4    **Q.**    With respect to Mr. Martinez, by the time agents got into

5    the unit, Mr. Martinez was already gone, correct?

6    **A.**    Correct.

7             MR. CUNHA:   I have no further questions, your Honor.

8             MR. SPENCER:   Judge, just on that.

9         **RECROSS-EXAMINATION OF TASK FORCE OFFICER JOSEPH TUOMA**

10   **BY MR. SPENCER:**

11   **Q.**    You stated that Mr. Fricas didn't have any connection to

12   the unit.

13   **A.**    Not that I know of.

14   **Q.**    Are you aware of any incentive that was provided to

15   Mr. Fricas to provide incriminating information against

16   Mr. Martinez?

17   **A.**    No.

18             MS. PORTER:   Objection, your Honor.

19             MR. SPENCER:   Nothing further.

20             THE COURT:   Asked and answered.

21             MR. CUNHA:   I'm all set.

22             THE COURT:   You may step down.

23             THE WITNESS:   Thank you.

24             THE COURT:   Does the Government have any further

25   witnesses?

1          MS. PORTER:  No further witnesses, your Honor.

2          THE COURT:  Do the defendants have any witnesses?

3          MR. SPENCER:  I do have one witness, Ms. Allison

4     Cornelio?

5          THE WITNESS:  Yes.

6          (The Witness was sworn.)

7          THE CLERK:  Please state your full name, spelling your

8     last name for the record.

9          THE WITNESS:  My name is Allison Jenny Cornelio.  Last

10    name is spelled C-O-R-N-E-L-I-O.

11         THE COURT:  Once again, C-O-R --

12         THE WITNESS:  C-O-R-N-E-L-I-O.

13         THE COURT:  Thank you.

14         MR. SPENCER:  May I inquire?

15         THE COURT:  Yes.

16              **DIRECT EXAMINATION OF ALLISON CORNELIO**

17    **BY MR. SPENCER:**

18    **Q.**   How old are you?

19    **A.**   I am 29.

20    **Q.**   What is your present address?

21    **A.**   I live at 162 Federal Street in Salem, Mass.

22    **Q.**   And how long have you lived at that address?

23    **A.**   I've been living there now for about three years or so.

24    **Q.**   Who do you live there with?

25    **A.**   I live there with my fiance and my son.

1    **Q.**    And what's your fiance's name?

2    **A.**    Jacques Mathieu.

3    **Q.**    Could you spell that, please.

4    **A.**    Yes.  It is J-A-C-Q-U-E-S, middle name T, last name

5    M-A-T-H-I-E-U.

6    **Q.**    What does he do for work?

7    **A.**    He works for MIT and he's also a private computer

8    engineer.

9    **Q.**    Do you work?

10    **A.**    I do.

11    **Q.**    What do you do for work?

12    **A.**    I am a master aesthetician.  I work for myself, Cath

13    Aesthetics, and I also work for a laser company in Danvers.

14    **Q.**    Just your educational history, briefly.

15    **A.**    I graduated from high school, attempted a little bit of

16    college and decided that wasn't for me, and decided to go into

17    trade school, which is how I obtained my master aesthetician's

18    license.

19    **Q.**    How many bedrooms does your -- is it an apartment or a

20    house?

21    **A.**    It's an apartment.  It has two levels to it.

22    **Q.**    And how many bedrooms does it have?

23    **A.**    There is three bedrooms.

24    **Q.**    Do you have any children?

25    **A.**    I do.  I have a ten-year-old son.

1   **Q.**   So there's a vacant bedroom?

2   **A.**   Yeah.  We use it as an office.

3   **Q.**   As an office?

4         You've got to say yes or no.

5   **A.**   Yes.

6   **Q.**   Do you know Mr. Jose Martinez?

7   **A.**   I do.

8   **Q.**   How do you know him?

9   **A.**   He is my brother.

10  **Q.**   Same mother and father?

11  **A.**   Yes.

12  **Q.**   His date of birth?

13  **A.**   His date of birth is July 19, '95, coming up shortly.

14  **Q.**   I'm sorry, and what's your birthday?

15  **A.**   My birthday is August 14.

16  **Q.**   Of what year?

17  **A.**   '89.

18  **Q.**   Has Mr. Martinez ever lived with you before?

19  **A.**   Yes, absolutely.

20  **Q.**   Could you describe for the Court those periods of time.

21  **A.**   So I lived with mom up until I was 18.  He was 13.  I

22  decided to leave to California because I wanted to try

23  something new and I was also married to a Marine who was

24  stationed in California.  I decided to take my brother with me.

25  I was pregnant at the time and I needed family, and I thought

1    he would be it for me.

2    **Q.**    So he lived with you in California?

3    **A.**    Yeah, he did, San Diego.

4    **Q.**    How long did he live in California for?

5    **A.**    He lived in California for about two years, three years.

6    He came back once he graduated.

7    **Q.**    Graduated from where?

8    **A.**    I believe it was -- what was it, like fourth or fifth

9    grade, something like that.  Yeah.

10    **Q.**    Okay.  You can't talk with each other.

11            So then did he live with you again?

12    **A.**    Yes.

13    **Q.**    Where was that?

14    **A.**    East Boston.

15    **Q.**    East Boston?

16    **A.**    Yes.  I decided to come back to the Massachusetts area,

17    but didn't want to live in the North Shore/Lawrence area.  So I

18    decided to live in East Boston.

19    **Q.**    How long was that?

20    **A.**    Years also.

21    **Q.**    How long did Mr. Martinez live with you during that

22    period?

23    **A.**    He was with me off and on, because he would always want to

24    see my mom.  Maybe like four, three years, off and on.

25    **Q.**    From what age period, speaking from his age, meaning

1    Mr. Martinez?

2  **A.**   He was about -- let me see.  I'm not sure, to be exact.

3  **Q.**   That's fine.

4  **A.**   I'm sorry.

5  **Q.**   Yeah.

6  **A.**   I'm sorry.

7  **Q.**   And then the most recent time he stayed with you is

8    162 Federal Street?

9  **A.**   Yes.

10  **Q.**   What time period was that, from what year to what year?

11  **A.**    That's been since I've been there, but again, he goes back

12    and forth to Lawrence.  He has my mom there and my other

13    siblings who he --

14  **Q.**   Do you recall where he received mail during this period of

15    time?

16  **A.**   My house.

17  **Q.**   And if he were released, if the Court decided to release

18    him with conditions, would you be willing to be some type of

19    third-party custodian for him?

20  **A.**   Absolutely.

21  **Q.**   By that, you promise by way of oath that you will assure

22    that the defendant, meaning Mr. Martinez, would abide by all

23    conditions of release set by the judge?

24  **A.**   Absolutely.

25  **Q.**   That responsibility would be on you?

1    **A.**    Yes.

2    **Q.**    And that you would promptly notify the court if you were

3    aware that Mr. Martinez in fact violated one of those

4    conditions?

5    **A.**    Absolutely.

6              MR. SPENCER:  I have nothing further.

7              THE COURT:  Do you want to examine?

8              MS. PORTER:  No, your Honor.

9              THE COURT:  You may step down.

10             THE WITNESS:  Thank you.

11             MR. CUNHA:  Judge, I do not intend to call them as

12   witnesses, but I would make a proffer as to --

13             THE COURT:  Who's here?

14             MR. CUNHA:  Yeah, who's here, and where I would

15   propose my client stay if he were to be released.

16             THE COURT:  Why don't you just point out who's here

17   and then I'll hear from the Government.

18             MR. CUNHA:  His dad is here.

19             Can you please stand up?

20             That's his father, he step-mother.  He's also got

21   other family members and friends who are the four people in the

22   bench behind -- yeah, one bench behind the parents.

23             THE COURT:  Okay.  Thank you.

24             Why don't I hear from --

25             MR. CUNHA:  Judge, I am not contesting probable cause.

1          THE COURT:  Okay.  So are you?

2          MR. SPENCER:  Yes.

3          THE COURT:  Okay.  So let me hear from the Government

4    first and then I'll hear.

5          MS. PORTER:  Thank you, your Honor.

6          I believe that the exhibits and the testimony of the

7    witness of the Government speak for themselves with respect to

8    probable cause.  I think it's clear there was communications

9    with a drug trafficking organization that agents had

10   information was known as Jay.  That individual, Jay, was

11   identified by Mr. Fricas as Jay to be Mr. Martinez.  There were

12   four different controlled purchases with an undercover agent

13   acting in the capacity as the buyer in each of those

14   situations.  We have recorded phone calls and video of the

15   meetings.

16          For two of these controlled purchases, Mr. Pena went

17   directly from 22 Chardon Street to meet with the undercover

18   agent and provided what's believed to be Fentanyl to the

19   undercover agent.  Both of those meetings, with respect to the

20   June 17th meeting, Mr. Pena went from 22 Chardon Street to meet

21   with the undercover agent and then went back to 22 Chardon

22   Street.  Evidence in the case that he went into the first-floor

23   unit, that is the only unit that is accessible by that front

24   porch area of that address.

25          THE COURT:  So the issue is going to be why should we

1    rely on Mr. Fricas and what do you have tying Mr. Martinez to

2    the residence since Mr. Pena is not contesting probable cause?

3           MS. PORTER:  Mr. Martinez admitted to agents that he

4    is the only one, along with his girlfriend, who lives in that

5    residence.  There's no indication that anyone else lives there.

6    There's absolutely nothing tying Mr. Fricas to that residence

7    whatsoever.  There's no reason that agents had any reason to

8    disbelieve Mr. Fricas and the information that he was

9    providing.  He hadn't been seen in that area before either.

10          Mr. Pena -- I'm sorry, excuse me.  Mr. Martinez fled

11   the scene as soon as agents arrived on site.  He jumped out of

12   the window and ran down the street.  I think that's further

13   evidence of his guilt and involvement in this conspiracy.

14   There's every reason to believe that there is an agreement

15   between Mr. Pena and Mr. Martinez, given the location of

16   22 Chardon Street, that Mr. Pena went from that location to

17   deliver the drugs to the undercover agent, and that there's

18   only evidence that Mr. Martinez is any of the individuals who

19   resided in that location.  I think that it's certainly

20   sufficient to get over the low standard of probable cause at

21   this stage in the proceedings, your Honor.

22          With respect to detention, I would note for the record

23   that Mr. Martinez has an open suspended drug case out of

24   New Hampshire.  Therefore, there's a rebuttable presumption

25   under 18 U.S.C., Section 3142(e)(2)(C).  The Government also

1    moves for detention under 18 United States Code, Section

2    3142(f)(1)(C) and 3142(f)(2)(A) with respect to both

3    defendants.   I believe there's a risk of flight in this case.

4    The evidence is quite strong.

5         Also, I would note, your Honor, with respect to danger

6    to the community, agents have every reason to believe that the

7    substance involved here is Fentanyl, which, as we know, is the

8    cause of a number of overdoses that are increasing at a

9    horrifying rate on a daily basis.   It's incredibly dangerous to

10   the community.

11        I would also note that in the course of executing a

12   search, agents found, as is shown by all of the exhibits that

13   the Government has offered here today, not only all of the

14   necessary items to do drug distribution, including pill

15   capsules, pill presses, it appears that Mr. Martinez was

16   flushing the evidence down the toilet.   That's shown by the

17   dirty green toilet water, which is the same color as the pill

18   capsules, as well as the tester -- excuse me, the statements of

19   Mr. Fricas that he observed Mr. Martinez walking with the

20   substances to the bathroom, that he heard flushing repeatedly.

21        Also, your Honor, the surveillance, the cameras that

22   were everywhere around that unit, are incredibly concerning to

23   the Government, as well as the firearms that were located, your

24   Honor.   A bullet-proof vest was found under Defendant

25   Mr. Martinez's bed.   Two rounds of the ammunition that go with

1    the assault rifle that was found in the basement were found in

2    Mr. Martinez's bedroom, the bedroom that he told agents was his

3    bedroom.  There was gun oil found in that bedroom.  There was

4    another attachment that was meant for the handgun that was also

5    found in the basement.

6         Then there are the two weapons that were found in the

7    basement in close proximity to Mr. Martinez's identification

8    and his wallet.  Those guns were found in a basement that is

9    not only for use of the first-floor unit; however, there were

10   items in Mr. Martinez's bedroom that directly tie him to those

11   two weapons that were found in the basement.  Both of them,

12   both the ammunition as well as the handle that was found that

13   goes with the handgun.

14        All of these factors, your Honor, I think show a real

15   risk of danger to the community as well as a risk of flight.

16   The Government does not believe that there are any combination

17   of conditions or conditions that would assure either of these

18   defendants' presence in court, nor assure the safety to the

19   community.  Thank you.

20        MR. SPENCER:  Judge, obviously we appreciate the

21   probable cause standard.  We know how low of a bar it is.

22   However, the charge is conspiracy.  They still have to show

23   some basis to conclude that Mr. Pena and Mr. Martinez entered

24   into an agreement.  It was a three-month-long investigation

25   with the conclusion being June 27th, and they didn't have one

1   iota of evidence that tied these two people together.  The only

2   evidence that they had that arguably ties these two people

3   together comes from another person in the house, which was

4   equally a suspect.

5       If Mr. Martinez decided to say oh, Mr. Fricas is your

6   guy -- so if you have Mr. Fricas that says Mr. Martinez is your

7   guy and Mr. Martinez says Mr. Fricas is your guy, how do you

8   have probable cause?

9       THE COURT:  So Mr. Martinez says it's his apartment,

10  it's his house.  He's living there.  His pants are there.  His

11  ID is in his pants.  And Mr. Pena is seen going in and out of

12  that house.  So --

13      MR. SPENCER:  Understood.

14      With respect to the identification, I think it was

15  found inside of a suitcase in the basement.  I didn't hear that

16  Mr. Martinez stated that he is the only person that had access

17  to the house, albeit the fact that he didn't stay there.

18      THE COURT:  He said he lived there and it was his

19  bedroom.

20      MR. SPENCER:  Yeah.  Right, and that was his bedroom.

21  I mean, fair enough.  I didn't hear any drugs that was found

22  inside of that bedroom.  Just because a person lives inside of

23  a residence doesn't mean that other people, including

24  Mr. Reynoso or Mr. Fricas, wouldn't have had the ability and

25  the intention, meaning that I don't necessarily think that

1     probable cause suggests that you must conclude that the owner

2     of the residence over potential suspects that are let go are in

3     fact culprits.

4          He had other indicia of evidence, like, for example,

5     evidence that they knew each other prior to --

6          THE COURT:  Well, they have evidence that he's going

7     in -- that Mr. Pena is going in and out of this house on

8     several occasions --

9          MR. SPENCER:  Understood.

10          THE COURT:  -- in connection with selling drugs.  I

11     mean, let's spend our time on the things that matter.

12          MR. SPENCER:  Sure.  Right.  No, and --

13          THE COURT:  I mean, it all matters, but I think --

14          MR. SPENCER:  I just wanted to make the argument, but

15     I appreciate it.  I understand the low standard.

16          THE COURT:  Okay.

17          MR. SPENCER:  So that being said, Judge, I would

18     submit that based upon the pretrial interview, we have a person

19     that appears to be drug dependent.  There was the charge of

20     Fentanyl, but yet there was some issue of cocaine found inside

21     the house, small amounts, user weight.  To my understanding

22     from the report and from speaking with my client, he has been

23     in detox withdrawal since he's been in Wyatt.  He's obviously a

24     person that's in need of some type of services.  I did present

25     his sister, who appears to be very responsible and structured,

1    and obviously cares for her brother a lot.  She said she would

2    be more than willing to be a third-party custodian for him.

3         I don't think that his record demonstrates that he's a

4    risk of flight.  He's a lifelong resident of Lawrence.  The

5    only issue is whether or not he poses a danger to the community

6    whereby releasing him to the custody of his sister does not

7    guarantee the safety of the community.

8         I would ask for terms and conditions of GPS monitoring

9    along with drug screens, drug treatment.  Obviously, remanded

10   to the custody to his sister.  If the Court requires some type

11   of weekly reporting and making sure that he stays on track with

12   his treatment.  Close monitoring, I think, based upon -- and

13   then, again, I would argue, just based upon the weight of the

14   evidence as of present against Mr. Martinez, that should also

15   factor in to whether or not -- although probable cause being

16   established.

17         THE COURT:  So what do I do with the fact that he has

18   lived with his sister, and I do appreciate all the family

19   coming and being involved.  I really do.  But he's lived with

20   his sister on and off.  He's got five years suspended for

21   having been found guilty in 2017 of possession with intent to

22   distribute.  He's found in a house with a lot of -- with drugs.

23         MR. SPENCER:  Being the New Hampshire case or this

24   case?

25         THE COURT:  Well, the New Hampshire case says he's had

1    some experience in the world of --

2             MR. SPENCER:  Narcotics.

3             THE COURT:  -- narcotics.

4             MR. SPENCER:  Yes.

5             THE COURT:  And now he's found in the house with

6    ammunition in his room and clearly drug -- some sort of drug

7    distribution going on in this house.

8             MR. SPENCER:  Sure.  There's no getting around it.

9    It's concerning.

10            THE COURT:  So I'm not -- I have a concern that his

11   sister does not exert the sufficient influence over him to keep

12   him out of trouble.

13            MR. SPENCER:  Sure.  Obviously, you know, there won't

14   be any drug dealing over at 162 Federal Street.  So even if

15   he's on some type of home confinement over at that residence

16   because it sounds like they run a pretty clean household, I

17   think the likelihood of risk of danger to the community would

18   be assured.  I don't see any reason why he would feel the need

19   to run from his sister's residence to go back to someplace

20   that's not so clean.

21            He obviously has an interest in trying to, you know,

22   stay sober, and I think perhaps his sister and I, I could

23   submit that perhaps a jail cell could accomplish that purpose

24   as well.  With that being said, Judge, we would just rest on

25   the arguments.

1              THE COURT:  Okay.

2              MR. SPENCER:  Thank you.

3              THE COURT:  Thank you.

4              MR. CUNHA:  Your Honor, I would ask you to accept the

5     recommendations of the Probation Department as I understand

6     them.  Mr. Pena is 18 years old.  He has just graduated high

7     school.  He has no prior record.  He was a -- I mean, I guess

8     he was a football start in high school.  He had a

9     scholarship -- he has a scholarship to go to junior college in

10    Kansas.  With somebody of his caliber player who doesn't have

11    the requisite grades, so the route to a four-year school as you

12    go two years to a junior college, the two places that he was

13    accepted are both football schools, known as junior college

14    football schools, and they feed into larger four-year

15    institutions.

16             I understand the nature of the offense and the

17    presumption, but he's got -- he's not going anywhere.  He

18    really doesn't have anywhere to go.  He does have ties to the

19    Dominican Republic through family, but he's only been there

20    once as a child.  His mother is actually visiting family there

21    right now, which gives us some problem with Condition No. 9

22    that's suggested by the Probation Department, that is that he

23    surrender a passport.  He does not know if he has a passport.

24    He remembers that he went at some point to the Dominican

25    Republic, so at some point he may have had a passport.  He

1  doesn't really know if he does, and if it is, if it's valid or

2  not valid.  His sense is that if there is a passport, whether

3  expired or unexpired, it's at his mother's house and there's no

4  one there right now.  They're in the Dominican Republic and

5  will be there for the next week or so.

6              THE COURT:  Well, what --

7              MR. CUNHA:  There's no --

8              THE COURT:  Why would his passport be in the Dominican

9  Republic?

10             MR. CUNHA:  No, no, no, his mother's house in

11 Lawrence.

12             THE COURT:  Oh.  But he can't get -- I'm sorry.

13             MR. CUNHA:  I didn't explain that very well.

14             THE COURT:  Sorry.

15             MR. CUNHA:  No, no.  He lived in -- up until arrest,

16 he lived with his mother in Lawrence.

17             THE COURT:  He lived with his mother.  Okay.

18             MR. CUNHA:  So all of his life and life's

19 accoutrements are in Lawrence.  His mother is visiting --

20             THE COURT:  I got that down.

21             MR. CUNHA:  Okay, just for a week or so, and there's

22 nobody at the house.  So there's nobody to go there to figure

23 out is there a passport --

24             THE COURT:  Okay.  I hear you.

25             MR. CUNHA:  -- is it valid, is it expired, and if one

1  can be located, can it be surrendered.  So I just want to make

2  you aware of that issue.

3          With respect to Recommendation No. 7, which is to

4  maintain or commence an education program, the problem is the

5  education program that he is supposed to commence in August is

6  in Kansas.  I mean, obviously we'd love to see him start at the

7  school, but No. 8, which is travel is restricted to the

8  District of Massachusetts, that's a pretty standard term of

9  release.  So there's a contradiction between those two

10 recommendations.

11         THE COURT:  Do you have any idea whether this is going

12 to affect his ability to start school?

13         MR. CUNHA:  I do not, Judge.  I have not contacted the

14 people out there.

15         I'm suggesting that he be released, that instead of

16 maintaining or commencing an education program, that he be

17 required to find a job.  He is a regular -- he has been

18 participating in this sort of specialized training that's

19 available to athletes of his caliber.  For instance, once a

20 month he gets a training regime from a professional trainer in

21 Boston who tells him over the next four weeks is what you've

22 got to do.  So he's a regular at a fitness gym which is right

23 near where he would be with his father.  He thinks he would be

24 able to get a job there.  There's also a McDonald's right

25 there.  He thinks he might be able to get a job there.

1      So I would suggest that until we determine what the

2  situation is and I come back to you with further information

3  about whether he would actually be able to begin his school,

4  that he be required to seek employment and to get a job.

5      THE COURT:  Okay.  Thank you.

6      Does the Government want to say anything or?  I mean,

7  go ahead.  Yes, no?

8      MS. PORTER:  No.  I would just -- your Honor,

9  obviously the Government moves for detention for both of these.

10  We think the grounds are strong for detention for both

11  defendants.  If the Court were inclined to consider release, we

12  would want to be heard on conditions, if the Court were to set

13  such conditions.

14      THE COURT:  So I'm going to take the matter under

15  advisement, but I'm going to ask Probation to interview

16  Mr. Pena's father, okay, and Mr. Martinez's sister.

17      Can you interview them today?

18      PROBATION OFFICER:  (Inaudible.)

19      THE COURT:  Alright.  I need that information.  If I'm

20  going to set conditions of release, I'll set a hearing date and

21  we can review the conditions at that time.  I don't know what

22  I'm doing yet, alright.  I'm going to read this.  I think

23  that's it.

24      MS. PORTER:  Thank you, your Honor.

25      THE COURT:  So the defendant needs to remain in

1    custody until I make a decision.  Thank you.

2              THE CLERK:  Court is in recess.

3              THE COURT:  Oh, no, we're not in recess.  I find

4    probable cause, on the record.  I do find probable cause for

5    the reasons that I've stated.

6              MR. SPENCER:  Thank you.

7              THE COURT:  Thank you.

8              THE CLERK:  The court is now in recess.

9

10             (The hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

I, Karen M. Aveyard, Approved Federal Court
Transcriber, do hereby certify that the foregoing transcript,
consisting of 71 pages, is a correct transcript prepared to the
best of my skill, knowledge and ability from the official
digital sound recording of the proceedings in the
above-entitled matter.

<u>/s/ Karen M. Aveyard</u>
Karen M. Aveyard

<u>January 18, 2020</u>
Date