UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>JOSE MARTINEZ,<br><br>            Defendant. | Criminal No. 1:19-cr-10273-RGS |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits this sentencing memorandum in connection with the sentencing of defendant Jose Martinez (hereinafter, the "defendant"). On February 12, 2020, a federal grand jury returned a superseding indictment charging defendant with one count of felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count 6), one count of felon in passion of ammunition, in violation of 18 U.S.C. §922(g)(1) (Count 7), and one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count 8). On August 21, 2021, the defendant pled guilty to all three counts, pursuant to a plea agreement. *See* Dkt. No. 90. The defendant's conduct not only reflects his involvement in the distribution of a deadly substance, but also the violent instruments that endanger his own community especially when mixed with drug dealing. A significant sentence is therefore necessary and warranted both to punish this defendant and to dissuade others from engaging in this type of dangerous conduct.

As detailed in the Final Pre-sentence Report ("PSR") prepared by the United States Probation Office ("Probation"), dated December 30, 2021, the defendant fled from his apartment as the agents forced entry. *See* PSR, at ¶ 20. Additionally, as set forth in the PSR, and described in detail below, the evidence indicates that the defendant destroyed evidence of his drug

1

trafficking, including by flushing drugs down the toilet, and smashing cellular telephones. *See* PSR, at ¶¶ 22-23.

Given the facts of this case, and the defendant's destruction of evidence, the government recommends that the Court sentence him to the high end of the guideline sentencing range ("GSR") as calculated by Probation—that is, 71 months of imprisonment, followed by 36 months of supervised release, and a mandatory special assessment of $200.

I.   **BACKGROUND OF THE CASE**

In the spring of 2019, the Drug Enforcement Administration (hereinafter, the "DEA") began an investigation into a drug trafficking organization (hereinafter, "DTO") in the Lawrence, Massachusetts area. *See* PSR, at ¶ 8. Agents obtained a cellular telephone number used by the DTO to arrange drug transactions with its customers. *See id.*

Between April and June 2019, an undercover agent (hereinafter, the "UC") made four controlled purchases of fentanyl from the DTO.[1] *See id.* The details of those four controlled purchases are set forth in paragraphs 10-19 of the PSR and are not restated here. *See id.*, at ¶¶ 9-19. In summary, for each controlled purchase, the UC made arrangements for the deal by contacting the DTO phone, and the UC ultimately met with an individual in Lawrence to complete the deals. *See id.*, at ¶¶ 8-19. For each of the controlled purchases, the UC met with co-defendant Ronyel Pena (hereinafter, "Pena"), who provided the UC with fentanyl ranging from approximately 20 grams to 80 grams per deal. *See id.* Each of the controlled purchases took place near the defendant's residence, 22 Chardon Street, Lawrence, Massachusetts (hereinafter, "22 Chardon"). *See id.* For the last two controlled purchases, agents observed Pena at 22 Chardon.

---

[1] The first transaction between the UC and the DTO was on April 29, 2019, when the UC met with an unidentified male who provided a sample of fentanyl to the UC (approximately 2.087 grams).

*See id.*, at ¶¶ 16 and 18. With respect to the controlled purchase on June 17, 2019, agents observed Pena travel to meet with the UC and supply the UC with 29 grams of fentanyl. Immediately following the deal, agents observed Pena go directly to 22 Chardon. *See id.*, at ¶ 16. With respect to the last controlled purchase on June 27, 2019, agents observed Pena enter 22 Chardon, remain inside for several minutes, then walk directly to meet with the UC to deliver 81.5 grams of fentanyl. *See id.*, at ¶¶ 18-19.

After placing Pena under arrest, agents went to 22 Chardon and observed multiple security cameras. *See id.*, at ¶ 20. After knocking and hearing movement inside, agents forced entry out of concern for potential destruction of evidence. *See id.* As agents entered the residence, the defendant attempted to flee out of a window, but was detained by agents at the perimeter of the property. *See id.* After obtaining a federal search warrant, agents searched 22 Chardon and found multiple items indicative of drug trafficking, as well as two firearms, ammunition, a gun attachment, and a bulletproof vest. *See id.*, at ¶¶ 20-25.

In the bathroom, agents found hundreds of empty green pill capsules and a smashed cell phone in the sink. *See id.*, at ¶ 22; *see also* Exhibit 1 (photograph of empty pill capsules); Exhibit 2 (photograph of smashed cell phone). Agents also observed that the toilet water was green, similar in color to the pill capsules. *See id.*; *see also* Exhibit 3 (photograph of toilet).

In the kitchen, agents found a monitor showing the security camera footage, a tray used to fill pill capsules, multiple smashed cell phones, a digital scale, a large amount of cash, lactose which is commonly used as cut to dilute drugs for sale, multiple plastic bags commonly used to package drugs for sale, and several wet bags containing a white chunky residue. *See id.,* at ¶ 23; *see also* Exhibit 4 (photographs from kitchen). The DEA Northeast Laboratory subsequently confirmed that the white substance in the bags contained fentanyl. *See id.,* at ¶ 23.

In the basement, agents found a loaded Kel Tec rifle caliber pistol and a Glock 26 handgun. *See id.*, at ¶ 24; *see also* Exhibit 5 (photograph of guns). The Kel Tec is a semi-automatic firearm that is capable of accepting a large capacity magazine. *See id.*, at ¶ 24. In the defendant's bedroom, agents found bullets that matched the ammunition found in the Kel Tec, as well as a gun attachment, gun oil, and a bulletproof vest. *See id.*, at ¶ 25; *see also* Exhibit 6 (photographs of bullets and bulletproof vest).

## II.     ADVISORY SENTENCING GUIDELINES

The Final Pre-sentence Report ("PSR") prepared by the United States Probation Office ("Probation"), dated December 30, 2021, concluded that the defendant's advisory guideline sentencing range ("GSR") was 57-71 months, based on a Total Offense Level of 23 and a Criminal History Category of III. *See* PSR, at ¶¶ 41, 48, and 96. The government agrees with this calculation and the defendant has not objected to the calculation.

## III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

### A. <u>Nature of the Offense</u>

The offenses with which the defendant has been convicted are extremely serious. First, the danger of fentanyl is well-documented. *See, e.g., United States v. Simms*, No. 1:19-CR-423, 2019 WL 7049930, *6 (N.D. Ohio Dec. 23, 2019) ("The distribution of fentanyl, one of the most deadly illegal drugs on the black market, poses an incredible threat to community members."); *United States v. Brown,* No. 17-00219-02, 2017 WL 4883375, *3 (W.D. Penn. Oct. 30, 2017) ("The Court is mindful that the distribution of fentanyl, in particular, has recently resulted in serious harm to the community—with multiple reports of overdoses and deaths resulting from that particular drug being reported in the news."). This Court is well aware that fentanyl is a deadly drug that has wreaked havoc in the United States, and more specifically in Massachusetts, over the past several

years.  Fentanyl remains the primary driver behind the ongoing opioid crisis, with fentanyl involved in more overdose deaths than any other illicit drug.  "Nearly 70 percent of all drug overdose deaths in the United States in 2018 involved an opioid.  Deaths involving synthetic opioids other than methadone—the category which includes fentanyl—increased by 10 percent according to data provided by the Centers for Disease Control and Prevention (CDC)."[2]  Fentanyl deaths are the most concentrated in states in the Great Lakes and in the Northeast of the United States.[3]

Massachusetts has been one of the states hardest hit by the opioid crisis and was among the top five states with the most fentanyl reports in 2019.[4]  In 2018, about 88% of drug overdose deaths in Massachusetts involved at least one opioid.[5]  These statistics are not hypothetical – they describe the opioid overdose crisis occurring right now in this district.  The epidemic is real and being felt every day by families across Massachusetts and New England.  The defendant's crime played a role in fueling this epidemic.

Moreover, the defendant's GSR is understated because he destroyed relevant evidence, specifically, it appears that he flushed or dumped both fentanyl pills and powder.  *See* Exhibits 1, 3, and 4.  Had the defendant not destroyed this evidence, it is likely that he would be facing a higher GSR based on increased drug weight attributable to him.  These facts weigh in favor of a

---

[2] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/documents/2021/03/02/2020-national-drug-threat-assessment#:~:text=The%202020%20National%20Drug%20Threat%20Assessment%20%28NDTA%29%20is,laundering%20of%20proceeds%20generated%20through%20illicit%20drug%20sales. at 7 (last visited February 7, 2022) (hereinafter "DEA 2020 Assessment").

[3] *Id.*, at 12.

[4] *Id.* at 8.

[5] National Institute on Drug Abuse, *Opioid-Related Overdose Deaths* (Revised March 2019), available at www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/massachusetts-opioid-summary (last visited on February 7, 2022).

sentence at the high end of the GSR.

Additionally, the defendant unlawfully possessed a semi-automatic firearm, a Glock handgun, ammunition, as well as a bulletproof vest. *See* PSR, at ¶¶ 24-25; *see also* Exhibits 5 and 6. These items were clearly possessed for the purpose of protecting the defendant's drugs and drug proceeds. The semi-automatic rifle-caliber "pistol" was loaded with AR-15 style ammunition, and the defendant also possessed additional ammunition for that firearm, as well as a bulletproof vest, a Glock handgun, and a sophisticated surveillance system. The semi-automatic firearm is not a weapon of self-defense; it is a weapon of intimidation and destruction. The types of weapons the defendant possessed could have brought serious tragedy to the community. Drug trafficking can be a dangerous endeavor, and drug traffickers often seek to protect themselves, their drugs, and their proceeds with firearms.[6]

### B. Characteristics of the Defendant

The defendant is 26 years old. Though his criminal history is not extensive, it is concerning. At the time he committed the offenses of conviction, he was only 23 years old and he was on probation for committing a similar offense in New Hampshire. *See* PSR, at ¶ 45. The defendant committed the New Hampshire offense when he was only 20 years old. *See id.* Now at the age of just 26 years old, he has two drug trafficking convictions and a conviction for unlawful gun possession.

The defendant has already shown a proclivity to recidivate. Moreover, the United States Sentencing Commission, in its report *Recidivism Among Federal Firearm Offenders*, highlights that firearm offenders recidivate at a higher rate than non-firearm offenders, regardless of age or

---

[6] The enhancement for possessing a firearm in connection with drug dealing reflects the increased danger of violence when drug traffickers possess weapons. USSG 2D1.1 n.11(A).

criminal history.[7]  The defendant's offenses and criminal history, therefore, warrant a significant sentence to adequately protect the public and discourage recidivism.

### C. Just Punishment, Promoting Respect for the Law, Specific and General Deterrence

A significant sentence of imprisonment is warranted to promote respect for the law, provide just punishment to the defendant, and to deter others from becoming involved in trafficking fentanyl and unlawful possession of firearms.  Individuals tempted to engage in drug trafficking must understand that *any* involvement with fentanyl will have immediate and harsh consequences.  A significant term of imprisonment is necessary to send a strong warning to others who might otherwise consider profiting from this deadly drug that they must resist the temptation.  Further, general deterrence must be considered for any other individuals similar to the defendant's status, that drug distribution is not a gainful way of life.

Considerations of specific deterrence also support imposition of a substantial term of incarceration.  The defendant has essentially lived his entire adult life engaged in criminal conduct.  Despite his prior drug trafficking conviction, he continued to commit the *same* offense.  Indeed, he was on probation for a prior drug trafficking conviction at the time he committed the instant offenses.  *See* PSR, at ¶ 45.  The sentence recommended by the government would send the message that continued criminal behavior, and destruction of evidence, will be met with serious consequences, and such a sentence will hopefully be sufficient to deter the defendant from resuming a life of drug distribution.

---

[7] https://www.ussc.gov/research/research-reports/recidivism-among-federal-firearms-offenders (June 2019) (last accessed February 17, 2022) (finding that over two-thirds of firearms offenders were rearrested for a new crime, compared to less than half of non-firearms offenders).  Additionally, a greater percentage of firearms offenders were rearrested for serious crimes than non-firearms offenders.  *Id.*

A significant term of imprisonment is necessary to send a strong warning to others who might otherwise consider involvement with this dangerous drug and these dangerous weapons that they must resist the temptation. Any sentence below the advisory guideline range would be inadequate to send such a message. A significant sentence—at the high end of the guidelines—is warranted here where the defendant destroyed evidence, which would have almost certainly resulted in a higher GSR. The sentence recommended by the government is warranted to punish the defendant, to promote respect for the law, and to dissuade others from distributing drugs that are killing tens of thousands of individuals nationwide. Simply put, lives are at stake.

## CONCLUSION

For the reasons set forth herein, as detailed in the PSR, as well as will be addressed at the sentencing hearing, the government believes that a sentence of 71 months imprisonment, followed by three years of supervised release, is the minimum sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553.

DATED: February 17, 2022                    Respectfully submitted,

                                            RACHAEL S. ROLLINS
                                            United States Attorney

                                    By:    /s/ Alathea E. Porter
                                            Alathea E. Porter
                                            Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                            /s/ Alathea E. Porter
                                            Alathea E. Porter
                                            Assistant U.S. Attorney